1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

* * *

7

BRADLEY ROBERTS,

Case No. 2:15-cv-00388-JAD-PAL

8

Plaintiff,

**ORDER**

9

v.

(Mot Compel – Dkt. #57)

CLARK COUNTY SCHOOL DISTRICT,

(Mot for Prot Ord – (Dkt. #60)

10

Defendant.

11

12        Before the court is Defendant's Motion to Compel (Dkt. #57) and request for Qualified

13    Protective Order (Dkt. #60). The court has considered the motions, Plaintiff's Oppositions (Dkt.

14    #75, #76), Defendant's Reply in Support of Motion to Compel Discovery and Responses and

15    Request for Qualified Protective Order (Dkt. #79, #80), and the arguments of counsel at a

16    hearing conducted December 8, 2015. Kathleen J. England appeared on behalf of the Plaintiff,

17    and Bruce Young and Ethan Thomas appeared on behalf of the Defendant.

18                                    **BACKGROUND**

19    **I.        The Amended Complaint**

20        The complaint and amended complaint in this case were filed in state court and removed

21    (Dkt. #1) March 4, 2015. Roberts has asserted claims for gender discrimination, retaliation in

22    violation of state and federal law and a state tort claim for negligent selection, training

23    supervision and/or retention. Plaintiff Bradley Roberts ("Roberts") is a transgender man

24    currently employed by Defendant Clark County School District ("CCSD") as a police officer.

25    Amended Complaint ¶ 14. He started as a part-time campus monitor in 1992 and was hired as a

26    school police officer in March 1994. *Id.* ¶¶ 15–16. He was born biologically female and

27    identified as female until late-2009 when he began formally transitioning to male. *Id.* ¶ 17.

28    / / /

1

By the beginning of the 2011 school year, he was identifying himself as a male transgender person.  *Id.*  Since then Roberts has been subjected to harassment and humiliation in his CCSD work place that began when he asked to have his records changed.  *Id.* ¶ 18.  Roberts believes CCSD had no policies or procedures in place for his request to be handled in a respectful and dignified manner, or that supervisory or managerial personnel were ignorant of any policies and procedures.  *Id.*  Roberts was subjected to inappropriate comments pertaining to his sexuality and experience, and to overly intrusive and unnecessary demands for information about his gender and genitalia by CCSD employees including supervisors and managers.  *Id.* ¶ 19.  There were numerous meetings in the workplace in October and November 2011, with CCSD personnel.  *Id.* ¶ 20.  Roberts was sometimes given conflicting directions and was told others were complaining about him.  *Id.* ¶ 21.  CCSD allowed complaints to continue, did not address them, and demanded that Roberts produce overly intrusive medical and personal documentation.  *Id.*  Roberts believed that if he did not comply with the requests he would not be permitted to "function and present himself as male." *Id.*

CCSD's actions interfered with his ability to properly perform his duties as a police officer and created troublesome situations that were blamed on him.  *Id.* ¶ 22.  At one point, Roberts was told he would be required to use the female restroom.  *Id.*  To avoid this awkward situation, Roberts was told to avoid and did avoid using any CCSD restroom facilities.  *Id.*  For a period of time he was forced to use outside commercial facilities.  *Id.*

CCSD's actions resulted in unnecessary disclosure of Roberts' private, personal and/or medical information to his supervisors and co-workers which subjected him to harassment and hostile work environment.  *Id.* ¶ 23.  In 2012, CCSD issued or instituted policies and procedures directed at transgender persons.  *Id.*  The policies seemed to be targeting Officer Roberts.  *Id.*  A memo prohibited CCSD police department employees from using children's restrooms unless prior authorization was secured from the school principal.  *Id.*  Officer Roberts was summoned to CCSD police department headquarters and required to sit and read the memo.  *Id.*  Roberts is aware of no other CCSD police department employee who was required to do so.  *Id.*

/ / /

**II.    CCSD's Motion to Compel/Request for Qualified Protective Order**

CCSD seeks an order compelling Roberts to respond to a first set of interrogatories and first set of requests for production served April 22, 2015.  Roberts responded to both sets of requests June 5, 2015, after receiving an extension.  CCSD also seeks an order compelling Roberts to respond to a second set of requests for production of documents served August 3, 2015.  Roberts served responses to these requests September 16, 2015.  Specifically, CCSD seeks to compel Roberts to provide supplemental Responses to the First Set of Requests for Production of Documents Nos. 9, 17, and 19, and Interrogatory Nos. 13, 14 and16.

Request for Production of Documents No. 9 requests copies of all documents which describe or relate to his diagnosis or treatment for any injury or condition for which Roberts seeks compensation from CCSD.  Interrogatory No. 13 requests Roberts to identify every healthcare provider who has examined or treated Roberts for the last ten years regarding his gender transition.  During the meet-and-confer process, CCSD offered to narrow the time period from 2009 to the present.  Interrogatory No. 14 seeks identification of any healthcare provider Roberts consulted or treated for emotional distress damages claimed in the complaint. Interrogatory No. 16 asks Roberts to identify all email addresses and social networking websites. Request for Production of Document No. 17 requests production of all documents including medical records pertaining to any surgeries Roberts has had performed and/or drug or hormone therapy undergone related to gender transition.  Request for Production of Document No. 19 requests execution of authorization releases to obtain medical, employment, administrative and tax records.

During the meet-and-confer process, and in arguments to the court, defense counsel explained that these requests were calculated to lead to the discovery of relevant evidence for several reasons.  First, the discovery would set a timeline of when Roberts actually began to transition, and when various phases of his transition occurred.  Second, CCSD seeks to discover if there is evidence of Roberts' alleged emotional distress.  Third, CCSD seeks discovery of the severity of the alleged emotional distress.  Fourth, CCSD seeks discovery of whether its actions were the cause of any alleged emotional distress.  Fifth, the discovery is relevant to "whether

other aspects of Roberts' life contributed to any alleged emotional distress."  Counsel for CCSD argues that the discovery is especially relevant because Roberts has admitted that the only significant damage he claims to have suffered is emotional distress.   CCSD contends that Roberts is attempting to wield his transgender status "as both a sword for pursuing the significant emotional distress damages requested and as a shield to prevent discovery of relevant information about Roberts' alleged emotional distress based on that same status."

With respect to CCSD's Second Request for Production of Documents, CCSD seeks an order compelling Roberts to respond to Request for Production of Documents No. 23 which requests all documents that describe, relate, or evidence Roberts' alleged garden-variety emotional distress suffered from October 2011 to the present.  Roberts responded indicating it was possible that all documents produced by Roberts so far in the litigation and all documents produced by CCSD are responsive to this request.  CCSD believes the response is evasive and that Roberts should be required to state specifically and precisely which documents will provide the desired information.

CCSD also seeks an order compelling Roberts to supplement Request for Production of Documents No. 26 which requests all documents or recordings provided to Roberts or Roberts' counsel from CCSD police officer Mike Thomas in relation to this lawsuit.  Counsel for Roberts indicated she was willing to make a thumb drive with the audio file of the December 17, 2012 recording of Officer Thomas' interview available for copying by an outside copy service.  CCSD argues that it should not be required to incur the unnecessary expense of having a thumb drive copied by a third party service.  Roberts' response to this request for production also disclosed that counsel had arranged to have a transcript of the audio file prepared by a certified court reporter and was willing to provide a copy to CCSD if it would share half of the cost.  During oral argument, counsel for Roberts explained that she had always been willing to make a copy of the audio file available.  She believed CCSD already had it.  She requested that counsel for CCSD make arrangements for an outside copy service to copy it so that she could not be accused of destroying or altering the original.  She offered a copy of the transcript if CCSD would share half the cost as a courtesy.

Finally, CCSD seeks a qualified protective order to allow it to subpoena Roberts' medical records directly from providers. Roberts has refused to provide written authorizations for the release of his medical records in response to CCSD's Request for Production No. 19. 45 C.F.R. § 164.512(e)(l)(i), a regulation enacted pursuant to the Health Information Portability Accountability Act ("HIPAA"), 42 U.S.C. § 299(b)-2, provides the means for obtaining relevant medical records for purposes of litigation via a qualified protective order when a party refuses to execute a HIPAA compliant authorization. Because Roberts has made broad emotional distress damages claims, CCSD is entitled to obtain all of the medical records sought. CCSD seeks attorney's fees and costs for the necessity of filing this motion.

## III.   Roberts' Response

Roberts opposes the request for a qualified protective order and the motion to compel on various grounds. Roberts responds by way of factual background that he is a 22-year veteran of CCSD police department. He changed his gender and name in 2011–2012, and asked CCSD to accept the change. His request resulted in multiple hurdles over many months. He was prohibited from using male restrooms at CCSD facilities. He was asked for medical records showing genital surgery even after he provided a new driver's license and the order for his name change. He endured taunting ridicule. On May 3, 2012, the Nevada Equal Rights Commission found that CCSD's restroom policy was illegal. However, CCSD did nothing to change its policy until October 2012. Roberts filed a motion for partial summary judgment on October 27, 2015, because he claims it is undisputed that CCSD subjected him to illegal discrimination and retaliation from October 2011 until October 2012 based on his transgender status.

On the merits, Roberts argues that the discovery in dispute CCSD seeks is overly intrusive information that exceeds the bounds of what is discoverable under federal law in this case. Roberts argues that CCSD's Interrogatory Nos. 13 and 14, and Request for Production of Documents Nos. 9, 17 and 19 are overbroad and intrusive requests for years of medical records and healthcare history. CCSD is seeking the same medical information in litigation it illegally demanded of Roberts in 2011 in the employment context. Roberts argues he has a right to medical privacy under state and federal law despite bringing this lawsuit. He is entitled to assert

the doctor-patient and psychotherapist-patient privilege, and to the protection afforded by HIPAA, 42 U.S.C. § 299(b)-2.  Citing *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999), Roberts argues that medical information about the anatomical status of his gender change is protected by recognized privacy rights.

Roberts reiterates arguments raised during the meet-and-confer process that the right to privacy is heightened here because CCSD is Roberts' current employer.  Roberts contends that discovery in this case should be more closely scrutinized because it involves an employer seeking to discover the private medical information of a current employee.  CCSD was unable to cite any case law authorizing an employer-defendant to conduct discovery on a transgender employee's medical records in a discrimination case.  It cited *In re: Consol. RNC No. 127*, 209 WL 130178 at *12 (S.D.N.Y. Jan. 8, 2009), which did not involve a transgender employee suing a current employer for discrimination violations, but a transgender individual suing the City of New York for civil rights violations for false arrest, false imprisonment, and malicious prosecution.

Roberts disputes that he is attempting to use his gender status as both a sword and a shield as CCSD claims.  Rather, he is seeking to protect his medical privacy on issues that stem directly from CCSD's illegal attempts to require him to "prove" his gender by medical records as a precondition for CCSD to accept him as male and allow him to use the men's restroom at work.

Roberts also maintains that all of his medical records are not relevant where, as here, he has only alleged a garden-variety emotional distress claim under Title VII.  He cites a number of Ninth Circuit cases for the proposition that emotional distress damages awards need not be supported by objective medical evidence, and that testimonial evidence alone is sufficient.  Roberts has not automatically put his medical or mental condition at issue simply by alleging garden-variety emotional distress.  CCSD will have the opportunity to depose Roberts to ascertain the extent and nature of his past emotional distress, and this is a more reasonable method of discovering this information in a garden-variety emotional distress claim.  CCSD relies heavily on *EEOC v. California Psychiatric Transitions*, 258 F.R.D. 391 (E.D. Cal. 2009),

to support its position that medical records should be disclosed.  However, in that case, the court only allowed discovery of the employee's medical records after the employee revealed at her deposition that she was still undergoing medical treatment for depression which raised a valid concern about the possibility of multiple causes of the employee's anxiety.  The court should require CCSD to pursue the less-intrusive route of simply asking Officer Roberts about his distress at a deposition before seeking highly private medical documents and history, including records pertaining to gender reassignment surgery and/or his usage of drug or hormone therapy.

The opposition cites a number of other decisions that have held that a garden-variety mental anguish or emotional distress claim for employment discrimination does not waive the physician and psychologist privileges.

Counsel for Roberts also argues that CCSD has a history of being careless with Roberts' privacy rights and tolerant of workplace gossip concerning his transgender status.  If the court is inclined to require production of the medical records, Roberts requests that the court conduct an *in camera* review and limit who may review any documents produced in discovery.

Roberts opposes CCSD's request for his social medial or email addresses conceding that in general, public social media content is neither privileged nor protected by any right of privacy. However, Roberts argues that filing a lawsuit does not give CCSD the right to rummage at will through information Roberts has limited from public view, and that CCSD should be required to make a threshold showing that the information sought is reasonably calculated to lead to the discovery of admissible evidence to avoid a proverbial fishing expedition.  Roberts cites a number of decisions in which courts have questioned whether social media activity is a probative reflection of a plaintiff's emotional state.  Additionally, Roberts argues that compelling him to identify his email addresses and social networking websites will allow CCSD to view all content on his social media accounts.  Citing *Kregg v. Moldonado*, 98 A.D. 3d 1289, 1290 951 N.Y.S. 2d 301, 302 (2002), Roberts claims that the proper means to obtain disclosure of relevant information in social media should be a narrowly-tailored discovery request seeking only the social media information that relates to the claimed injuries arising from the complaint.

/ / /

Finally, Roberts argues that his responses to Request for Production of Documents Nos. 23 and 26 were accurate and adequate. Roberts asks for an award of attorney's fees and costs pursuant to Fed. R. Civ. P. 37(a)(5)(B) for the necessity of opposing the motion to compel.

Roberts' opposition to CCSD's request for qualified protective order essentially asserts the same arguments concerning the privacy of Roberts' personal and private medical records and information. If the court is inclined to order production of a portion of Roberts' medical records and history, Roberts requests that the court order CCSD to limit the disclosure of the information disclosed to specified individuals on CCSD's litigation team, and order that they not disclose the information to anyone who might be influenced or have responsibility for making employment decisions about him. Roberts also requests that the court warn CCSD that dissemination of this information directly or indirectly is strictly prohibited, and that CCSD as an employer is not entitled to have the information at all. Specifically, Roberts wants to preclude in-house legal counsel for CCSD, Jon Okazaki and Scott Greenberg, from obtaining Roberts' private medical information. These are the attorneys who allegedly formulated the discriminatory and illegal policy that prohibited Roberts from using the male restrooms at work and told him he was prohibited from using the men's room unless he provided medical proof of his gender change.

## IV.    CCSD's Reply

CCSD replies that it recognizes that its requests for medical information and documentation implicate Roberts' privacy rights. However, the right to privacy is not absolute. A number of courts have held that enforcing restroom use practices based on biological gender is not unlawful. Therefore, "permitting discovery of this critical area of Plaintiff's alleged damages is neither improper nor a ratification of CCSD management's past conduct as Roberts alleges in his attempt to thwart the relevant request to discovery." CCSD reasserts arguments that Roberts brought his mental, emotional, and physical condition into question by filing the lawsuit. "Despite this fact, Plaintiff continues to act as if this case is different from other employment discrimination cases because he is transgender." A protective order is in place that identifies medical records or information as confidential and limits the purposes and persons to whom the information is disclosed. The protective order is adequate to protect Roberts' privacy interests.

The reply reiterates arguments that Roberts has not invoked the psychotherapist-patient privilege. However, even if Roberts had asserted the psychotherapist-patient privilege, the records should be disclosed even if he is asserting a garden-variety emotional distress claim. CCSD must be free to test the truth of Roberts' emotional distress allegations. To prevent CCSD from discovering Roberts' prior medical and psychological history while permitting him to testify regarding non-economic damages would deprive CCSD of a fair trial.

Finally, CCSD argues that *in camera* review is not necessary, and that the court should grant its motion for a qualified protective order to allow CCSD to obtain Roberts' medical and other records directly from the custodians of those records.

## DISCUSSION

### I.     Fed. R. Civ. P. 26

Fed. R. Civ. P. 26(b)(1) permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Discovery is not limited to admissible information. *Id.* However, "[a]ll discovery is subject to the limitations imposed by Rule 26(b)(2)(C)."

In deciding whether to restrict discovery under Rule 26(b)(2)(C) "the court should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court." *Smith v. Steinkamp*, 2002 WL 1364161, at *6 (S.D. Ind. May 22, 2002) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (internal quotations omitted)). *See also Rowlin v. Alabama Dep't. of Pub. Safety*, 200 F.R.D. 459, 461 (M.D. Ala. 2001) ("courts have the duty to pare down overbroad discovery requests under Rule 26(b)(2) . . . The court should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it, discounted by society's interest in furthering the truthseeking function") (citing *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1033–34 (9th Cir. 1990)).

Since the late 1970s, the Supreme Court and the Advisory Committee on the Civil Rules have encouraged trial courts to exercise their broad discretion to limit and tailor discovery to avoid abuse and overuse. The trial courts have been urged to actively manage discovery to

accomplish the goal of Rule 1 of the Federal Rules of Civil Procedure—"to secure the just, speedy, and inexpensive determination of every action and proceeding."

In 1983, Rule 26 was amended to add subsection (g), which provides that a lawyer filing a discovery request, response or objection certifies by signing the document that it is "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  Fed. R. Civ. P. 26(g)(1)(B)(ii).  A lawyer signing a discovery document also certifies that it is "neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action."  Fed. R. Civ. P. 26(g)(1(B)(iii).

The Advisory Committee Notes for the 1983 amendments to Rule 26 emphasize that the elements of Rule 26(b)(1)(iii) were intended to address the problems of disproportionate discovery.  Federal judges were urged to evaluate the nature of the case, the limitations on a financially weak litigant to bear the burden of expensive discovery, and the need to prevent discovery from becoming a "war of attrition or as a device to coerce a party, whether financially weak or affluent."  97 F.R.D. 165, 218 (1983).  Rule 26(g) was added to address the reluctance of judges to impose sanctions on attorneys who abuse the discovery rules.  *See* Brasil, *Civil Discovery: Lawyers' Views of its Effectiveness, Principal Problems and Abuses*, American Bar Foundation (1980).  As one well-respected treatise observed, "Rule 26(b) was amended in 1983 to promote judicial limitation of the amount of discovery on a case-by-case basis to avoid abuse or overuse of discovery through the concept of proportionality."  8 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2008.1 (3d ed. 2015).  The Advisory Committee notes reported that "Ruled 26(g) makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it.  This authority derives from Rule 37, 28 U.S.C. § 1927, and the court's inherent power."  (citation omitted.)

By 1997, nearly one-third of the lawyers surveyed by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense.  *See* D. Stienstra, *Implementation of Disclosure in United States District Courts, with Specific Attention*

/ / /

*to Courts' Responses to Selected Amendments to Federal Rule of Civil Procedure 26*, Federal Judicial Center (Mar. 30, 1998) at 44.

In 1998, the Supreme Court wrote that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 599 (1998). The Supreme Court recognized that under Rule 26(b)(2), the trial court may, on its own motion, limit the frequency or extent of use of discovery methods if it determines the burden or expense of proposed discovery outweighs its likely benefits. *Id*. Rule 26(c) gives the trial court authority on motion, or on its own initiative, to limit the time, place, and manner of discovery, or bar discovery altogether on certain subjects, as required "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id*. Similarly, under Rule 26(d), the court may set the timing and sequence of discovery. *Id*. The *Crawford-El* decision emphasized that the trial court has broad discretion under Rule 26 in managing discovery "to facilitate prompt and efficient resolution of the lawsuit." *Id.*

In 2000, Rule 26 was again amended to call attention to the limitations of Rule 26(b)(2)(C). The Advisory Committee Notes indicate that the Advisory Committee was repeatedly told "that courts have not implemented these limitations with the vigor that was contemplated." 192 F.R.D. 340, 390 (2000). Thus, Rule 26 was amended to add an "otherwise redundant cross-reference . . . to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery." *Id.* (citing *Crawford-El*, 523 U.S. at 598).

Recently, Chief Justice John Roberts issued his Year-End Report on the Federal Judiciary in which he addressed the 2015 amendments to the Federal Rules of Civil Procedure at length.[1] The Chief Justice traced the "elaborate and time-consuming" procedure for promulgating and amending the rules which began in 2010 when the Advisory Committee on the Civil Rules sponsored a symposium on civil litigation attended by federal and state judges, law professors, plaintiff and defense lawyers, and representatives from business, government, and public interest organizations. The symposium identified the need for procedural reforms to: (1) encourage

---

[1]   John Roberts, 2015 Year-End Report on the Federal Judiciary (Dec. 31, 2015), *available at* http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf

greater cooperation; (2) focus discovery on what is truly needed to resolve cases; (3) engage judges in early and active case management; and (4) address serious problems associated with vast amounts of electronically stored information. *Id*. at 4–5.

The Chief Justice's Year-End Report wrote that the changes that went into effect on December 1, 2015, "may not look like a big deal at first glance, but they are." *Id*. at 5. It was the reason he decided to highlight them in his report. Rule 1 was expanded to add eight words to emphasize "the obligation of judges and lawyers to work cooperatively in controlling the expense and time demands of litigation." *Id*. at 5–6. Rule 1 now directs that the Federal Rules "should be construed, administered, *and employed by the court and the parties* to secure the just, speedy, and inexpensive determination of every action and proceeding." *Id*. at 6 (emphasis in original). Chief Justice Roberts stated that lawyers representing adverse parties "have an affirmative duty to work together, and with the court, to achieve prompt and efficient resolutions of disputes." *Id*.

The 2015 amendments to Rule 26(b)(1) emphasize the need to impose "reasonable limits on discovery through increased reliance on the common-sense concept of proportionality." *Id*. The fundamental principle of amended Rule 26(b)(1) is "that lawyers must size and shape their discovery requests to the requisites of a case." *Id*. at 7. The pretrial process must provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery. This requires active involvement of federal judges to make decisions regarding the scope of discovery.

Chief Justice Roberts observed that the 2015 amendments to the civil rules "are a major stride towards a better federal court system," but accomplishing the goal of Rule 1 will only occur "if the entire legal community, including the bench, bar, and legal academy, step up to the challenge of making real change." *Id*. at 9. He appealed to judges "to take on a stewardship role, managing their cases from the onset rather than allowing parties alone to dictate the scope of discovery" and to actively engage in early case management to "identify the critical issues, determine the appropriate breadth of discovery, and curtail dilatory tactics, gamesmanship, and procedural posturing." *Id*. at 10–11. He beseeched judges and lawyers to "engineer a change in

our legal culture that places a premium on the public's interest in speedy, fair, and efficient justice." *Id*. at 11.

## II.     Analysis and Decision

A change in the legal culture that embraces the leave no stone unturned and scorched earth approach to discovery is long overdue.  Discovery overuse and abuse is depriving ordinary citizens, even those with considerable means, of having their cases heard in federal court. Discovery is more often than not too expensive and time consuming to result in an efficient and just result.  Heeding the call to actively manage and engineer a change in this legal culture, CCSD's motion to compel is granted in part and denied in part as described below.  The motion for a qualified protective order is denied.

The gravamen of Roberts' claims in this case is that he was subjected to unlawful sex discrimination in violation of Nevada law and Title VII when he informed CCSD that he had transitioned, and asked to have his records changed to reflect he was male.  He made this request after a court of competent jurisdiction entered an order changing his name, and the Nevada Department of Motor Vehicles issued a driver's license in his new name which recognized his male transgender status.  Roberts claims CCSD caused him emotional distress by the way it handled his request for a records change; because it refused to allow him to use the men's restroom until he provided medical evidence that he was biologically or anatomically male; and by employees and supervisors asking questions about his genitalia.  In this motion to compel, CCSD essentially argues that Roberts must provide proof of his genitalia, and the details of his transgender treatment and stages in the process to prove CCSD violated Title VII and/or caused him emotional distress.  The court categorically rejects this position.  The phrase "private parts" has been in my vocabulary for more than 50 years for good and common sense reasons.  It is difficult to fathom a subject more likely to cause embarrassment than requesting proof of one's genitalia.

Roberts is not claiming that his emotional distress is caused by his transgender status as CCSD seems to claim in its motion to compel.  *See* Motion at 13:13–15 (arguing Plaintiff is attempting to use his "transgender status both as a sword for pursuing the significant emotional

distress damages requested and as a shield to prevent discovery of relevant information *about Plaintiff's alleged emotional distress based on that same status.*") (emphasis added).  To the contrary, counsel for Roberts made it clear during oral argument that Roberts will testify how pleased he is that he went through the transgender transition process.  Roberts' claim is that CCSD employees, supervisors and in-house counsel caused him emotional distress by the manner in which they responded to his request for a change in his personnel file to reflect he is a transgender male, instructions not to use the male restrooms, demands for proof of male anatomy, and by questions asked by employees and supervisors about his genitalia.

The Nevada Legislature amended Nevada's anti-discrimination statute in 2011, to specifically prohibit discrimination based on "gender identity or expression."  *See* NRS 16.330(1)(a).  The statute went into effect October 1, 2011.  Roberts made the requests at issue beginning on October 4, 2011.

On May 2, 2012, the Nevada Equal Rights Commission ("NERC") found that CCSD engaged in sex discrimination within the meaning of NRS 613.310 by telling Roberts at a meeting on November 14, 2011, that he could not use the male restroom until he had provided legal documentation stating he had changed his gender from female to male.  NERC also found that at another meeting on November 22, 2011, CCSD reiterated its position that Roberts could not use the male restroom until he had a sex change surgical procedure.  *See* NERC determination letter, attached as Exhibit A to Plaintiff's opposition.  According to the NERC determination letter, CCSD did not offer any explanation for its policy "other than a previous case in which the court found that requiring a pre-operative male to female transgender to use gender-neutral or single occupant restroom was not unlawful discrimination."  *Id*.  NERC acknowledged that courts had recognized the legitimacy of restrooms segregated on the basis of sex.  However, it found probable cause to support the charge of discrimination based on gender identity or expression in violation of NRS 613.310 because "to create restrooms for each sex, but then to require Roberts to prove conformity with respondent's [CCSD's] expectations regarding the male anatomy in order to use the men's bathrooms violates Nevada's anti-discrimination law."  *Id*.

In oral argument on the motion to compel, and in its response to Roberts' motion for partial summary judgment, CCSD argues that Nevada's anti-discrimination statute goes further than Title VII in providing protection from sex discrimination to transgender individuals.   On April 20, 2012, the U.S. Equal Opportunity Commission ("EEOC") issued its opinion in *Macy v. Holder*, 2012 WL 1435995.   The Commission accepted the appeal to resolve confusion regarding this recurring legal issue and to clarify the Commission's position "that claims of discrimination based on transgender status, also referred to as claims of discrimination based on gender identity, are cognizable under Title VII's sex discrimination prohibition." *Id.* at *4.  The Commission cited *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000), *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004), and *Glenn v. Bramby*, 663 F.3d 1312, 1316 (11th Cir. 2011) to support its determination.   Relying on these cases, the Commission found that Title VII's prohibition on sex discrimination "proscribes gender discrimination and not just discrimination on the basis of biological sex." *Id.* at *6. It found that the term "gender" includes "not only a person's biological sex, but also the cultural and social aspects associated with masculinity and femininity." *Id.*

The EEOC also relied on the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), which held that gender discrimination occurs anytime an employer treats an employee differently for failing to conform to any gender-based expectations or norms.   In *Macy* the EEOC concluded "that intentional discrimination against a transgender individual because that person is transgender is, by definition, discrimination 'based on…sex' and such discrimination therefore violates Title VII."

CCSD argues it is entitled to the discovery it seeks because Roberts is attempting to assert a Title VII discrimination claim based on his transgender status and has therefore put his anatomy and the medical records that establish the details of his transition at issue. In its opposition to Roberts' motion for partial summary judgment CCSD argues that the EEOC's interpretation and opinion in *Macy* should not be given deference because it is unpersuasive and because there is contrary Ninth Circuit authority directly on point.   CCSD cites *Kastl v. Maricopa County Community College District*, 325 Fed. Appx. 492, 2009 WL 990760,

2009 U.S. App. LEXUS 7833 (9th Cir. Apr. 14, 2009) to support this proposition.  The court disagrees.  In *Kastl*, the Ninth Circuit upheld the district court's grant of summary judgment to the employer on plaintiff's gender discrimination claims under Title VII and Title IX.  There, the employer banned Kastl, who is transsexual, from using the women's restroom until she could prove completion of sex reassignment surgery.  Kastl identified and presented full-time as female, and argued to her employer that the men's room was not only inappropriate, but also potentially dangerous to her.

Citing *Hopkins*, the Ninth Circuit commented that the Supreme Court has found that "gender stereotyping is direct evidence of sex discrimination prohibited by Title VII."  *Id*.  Citing its own decision in *Schwenk*, the Ninth Circuit noted that it had held that, in the context of the Gender Motivated Violence Act ("GMVA"), 42 U.S.C. § 13981(c), "transgender individuals may state viable sex discrimination claims on the theory that the perpetrator was motivated by the victim's real, or perceived non-conformance to socially-constructed gender norms."  *Id*.  The *Kastl* court stated that "after *Hopkins* and *Schwenk*, it is unlawful to discriminate against a transgender (or any other) person because he or she does not behave in accordance with an employer's expectations for men or women."  *Id.*  It therefore found that *Kastl* had stated a prima facie case of gender discrimination under Title VII under the theory that impermissible stereotypes were a motivating factor in the employer's actions against her.  However, the employer proffered evidence that it banned Kastl from using the women's restrooms for safety reasons.  Kastl did not come forward with evidence demonstrating that the employer was motivated by her gender, and therefore, "her claim is doomed at the third *McDonald-Douglas* stage."  *Id.*  Although Kastl lost her case, the Ninth Circuit clearly held that she had stated a prima facie claim of Title VII gender discrimination as a transgender individual who was told she could not use the women's restroom based on the employer's expectations about men and women and gender stereotypes.

Here, it is undisputed that CCSD asked for medical evidence of Roberts' transgender transition in response to his request to change his records to reflect he was a transgender male.  It is undisputed that CCSD told Roberts he would not be permitted to use the men's room unless

and until he provided proof that he was biologically male.  It is undisputed that Roberts declined to provide medical evidence of the nature of the procedures and treatments he had received or medical records establishing his genital anatomy.  The court finds CCSD simply does not need to know the intimate details of his transgender transition process to defend itself on these claims.  If the district judge finds Roberts was required to provide the evidence CCSD demanded before he could change his records, be recognized as a transgender male, or use the men's restroom, and prevent employees and supervisors from asking about his genitalia, Roberts will lose his Title VII claim.  If the district judge finds Roberts was not required to disclose this information, CCSD never had and still has no legitimate need for this extremely private information.

CCSD claims it has a legitimate interest in obtaining medical records discovery to establish the timeline of Roberts' transition.  Roberts' complaint alleges that he began his transition in 2009.  He began presenting as male and made the request to change his records to reflect he was a transgender male in 2011.  CCSD does not dispute that he began presenting as male and made his request for a records change in 2011 after NRS 613.330 went into effect.  Rather, CCSD asks for the names, addresses, and dates of consultation of each health care provider who examined, treated or with whom Roberts has consulted for the last ten years regarding his gender transition.  During the meet-and-confer process, CCSD agreed to limit the time period requested for Interrogatory No. 13 to 2009, to the present.  CCSD's requested medical discovery is essentially seeking proof of whether Roberts is biologically male, and when he developed male anatomy to support its defense that it did not discriminate against him.  Unless and until the district judge finds he is required to provide this evidence, the court will not require Roberts to disclose the state of his genitalia or the intimate details of his transgender transition.

CCSD also asks for broad discovery of Roberts' medical records asserting the records are relevant or may lead to the discovery of relevant evidence concerning Roberts' emotional distress claim.  Specifically, CCSD argues the records may contain evidence of Roberts' emotional distress, the severity of Roberts' emotional distress, whether CCSD's actions are responsible for his emotional distress, and whether other aspects of his life contribute to his

emotional distress.   For example, CCSD speculates that Roberts may have experienced significant emotional distress undergoing the transgender transition.

Roberts answered Interrogatory No. 14, which asked him to identify any health care provider he consulted or received treatment from as a result of any alleged damages, including emotional distress damages he claims was caused by CCSD.  Roberts' answer to Interrogatory No. 14 indicated "none are necessary for Plaintiff who is seeking Title VII compensatory damages for garden-variety emotional distress caused by CCSD's handling of the matter of his gender transition."  However, he identified Jane Heenan as a therapist and community activist for transgender individuals who attended meetings with CCSD and Roberts.  Request for Production of Documents No. 9 requested copies of any and all documents describing or relating to a diagnosis or treatment for any illness, injury, or condition for which Roberts was seeking compensation from CCSD.  Roberts responded that, to the extent the request was seeking medical records "there are none and none are necessary" for Plaintiff to recover garden-variety emotional distress damages.  Roberts answered this request for production.  He has stated under penalty of Rule 26(g) that there are no such records.  He will be precluded from supporting his claim with any evidence or testimony not timely disclosed in motion practice, at trial, or for any other purpose.

The court will compel Roberts to clarify what counsel represented in oral argument—that he has not consulted with any health care provider to receive treatment for emotional distress. Rather, he intends to rely upon his own testimony about how CCSD's actions and inactions caused him emotional distress.  If he intends to rely on Heenan's testimony or any other person's testimony to support his emotional distress claim, he will be required to disclose the name of any witness and provide a summary description of the expected testimony.

Garden-variety emotional distress has been described by one court as "ordinary or common place emotional distress," which is "simple or usual."  *Fitzgerald v. Cassil*, 216 F.R.D. 632, 637 (N.D. Cal. 2003).  It is contrasted to emotional distress that " 'may be complex, such as that resulting in a specific psychiatric disorder'."  *Id.* (quoting *Ruhlmann v. Ulster County Dep't of Soc. Servs.*, 194 F.R.D. 445, 449 n.6 (N.D.N.Y. 2000)).  A number of courts in the Ninth

Circuit have held that the physician-patient privilege is not waived where a plaintiff alleges "garden-variety" emotional distress and does not rely on medical records or medical expert testimony for proof at trial.  *See, e.g.*, *EEOC v. Wal-Mart Stores, Inc.*, 276 F.R.D. 637, 640–41 (E.D. Wash. 2011) (collecting cases and finding that the physician-patient privilege was not waived as to plaintiff's medical records because she intended to support her garden-variety emotional distress damages through evidence other than medical records or expert testimony).

The court agrees with counsel for Roberts that CCSD's requests for medical evidence are overbroad because CCSD claims they might possibly contain some reference to Roberts' emotional distress or state of mind.  The requests are not narrowly tailored to obtain this information.  In fact, CCSD is requesting that the court not only compel the identification of all health care providers, but enter a qualified protective order so that CCSD can directly obtain *all* of Roberts' medical records from all of Roberts' health care providers who were involved in or consulted in connection with his transgender transition from 2009 to the present.

CCSD will have the opportunity to depose Roberts to learn exactly what his emotional distress claims are.  CCSD will have the opportunity to test Roberts' claims under oath, explore the alleged severity of his distress, any physical or emotional manifestations of his distress, whether any other stressors in his life may have contributed to his distress, including the transition process itself.  CCSD may fully inquire whether he treated or sought treatment from any provider, counselor, or advisor to cope with stress he attributes to CCSD, whether he has any prior history of emotional distress, depression, anxiety and related disorders, and any witnesses who may support his claims.  However, the court will not compel Roberts to disclose and produce all of his medical records from 2009 to the present on the speculation they may contain references to his mental state or emotional distress.  He has answered under penalty of Rule 26(g) that he has not received treatment for emotional distress and is only asserting a garden-variety emotional distress claim.  His counsel has assured the court that he does not intend to rely on any medical records or expert testimony to support his claim.  However, Roberts will be precluded from introducing or using evidence of emotional distress damages in motion practice, at trial, or for any other purpose, that he does not disclose.

The court will also not require Roberts' to identify all of his personal email addresses and social networking websites with account name and corresponding addresses.  Interrogatory No. 16 is overbroad and not narrowly tailored to obtain discoverable information on social media about Roberts' emotional distress relevant to this lawsuit, or other factors in his life that may have contributed to his emotional distress during the time period in dispute.  However, to avoid a future dispute over a subsequent discovery request, the court will require counsel for Roberts to identify all of the social media sites on which Roberts has had an account from 2011 to the present.  The court will also require counsel for Roberts to review the content of those accounts from January 2011, to the present, and to produce any content that contains a reference to this lawsuit, CCSD's response to Plaintiff's transgender transition, Roberts' state of mind, emotional or physical response or reaction to his transgender transition, and the manner in which he was treated by CCSD employees, managers, supervisors, and counsel.  The supplemental response will be signed with the certification required by Rule 26(g)(1)(A).

Request for Production of Documents No. 17 asks for all documents including medical records pertaining to any surgeries Roberts has had performed and/or any drug or hormone therapy undergone related to gender transition.  For the reasons explained in this order, the court will deny the request to compel further response to Request for Production No. 17.  The court will also deny CCSD's request to require Roberts to produce executed authorizations to obtain medical, employment, administrative, and tax records.  Roberts has been employed by CCSD for 22 years.  CCSD knows what he makes.  It knows what is in his personnel file. CCSD has articulated no legitimate reason why it needs all of Roberts' administrative records, educational records, tax records and protected health information to defend this case.  The discovery sought is grossly out of proportion to what CCSD legitimately needs to know to defend itself from claims CCSD discriminated against Roberts and caused him garden-variety emotional distress and will be denied.

The court will compel Roberts to supplement and clarify his response to Request for Production No. 23.  It asks Roberts to produce documents that describe, relate, or evidence his garden-variety emotional distress from October 2011 to the present, which Roberts alleges was

caused by CCSD.  Roberts responded that it is possible that all documents he has produced and all the documents CCSD has produced so far may be responsive to this request.  The court finds this response evasive and non-responsive.  If Plaintiff knows of any specific documents that are evidence of his garden-variety emotional distress claim, he must identify and disclose the documents.  If the documents have already been disclosed in discovery, he must identify which documents he claims are evidence of his emotional distress.

Finally, the court will deny CCSD's motion to compel Request for Production of Documents No. 26 which asks for all documents and recordings provided to Roberts or his counsel from CCSD Police Officer Mike Thomas related to this lawsuit.  Plaintiff responded that he was willing to make the thumb drive of the audio file available for copying with a third-party copy service.  CCSD moved to compel because it does not believe it should have to incur the expense of having the audio file copied from a thumb drive.  Counsel for Roberts explained that she wanted an outside service of CCSD's choice to copy it so that she could not be accused of altering or destroying the original.  This dispute borders on the ridiculous.  It is clear to the court that counsel for Roberts was not trying to cause CCSD unnecessary expense.  She was trying to avoid accusations she may have destroyed or altered original evidence in this very contentious case.  During oral argument, counsel for Roberts offered to have the thumb drive copied herself, and produced to defense counsel.  The court will require her to live up to her offer.

Finally, the court will deny CCSD's request for attorney's fees and costs as a sanction for the necessity of filing these motions.  The court will also deny Roberts' request for attorney's fees and costs for the necessity of opposing both motions.  The court will not order monetary or other sanctions when it finds that a position was substantially justified in that the parties had a genuine dispute on matters on which reasonable people could differ as to the appropriate outcome.  *See Pierce v. Underwood*, 487 U.S. 522, 565 (1988).  With the exception of the dispute over the audio file, the parties had substantial disputes on which reasonable minds could differ.  Under these circumstances, sanctions are not warranted.

For the reasons explained in this decision,

/ / /

21

**IT IS ORDERED** that:

1.  Defendant's Motion to Compel (Dkt. #57) is **GRANTED in part** and **DENIED in part** consistent with this order.  Plaintiff will be required to supplement discovery responses for which the motion was granted no later than **January 25, 2016**.

2.  Plaintiff will be precluded from supporting his claims with any evidence or testimony not timely disclosed in motion practice, at trial, or for any other purpose.

3.  CCSD's Motion for a Qualified Protective Order (Dkt. #60) is **DENIED**.

4.  The parties' requests for sanctions are denied.

5.  Any request for relief not specifically addressed in this order is **DENIED**.

DATED this 11th day of January, 2016.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE