1

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Bradley Roberts, | 2:15-cv-00388-JAD-PAL |
|     Plaintiff | **Order Granting in Part Bradley Roberts's Motion for Partial Summary Judgment, Denying the School District's Countermotion for Partial Summary Judgment, and Granting Roberts's Motion for Leave** |
| v. | |
| Clark County School District, | |
|     Defendant | [ECF Nos. 54, 89, 143[1]] |

11

12

13

14

      Plaintiff Bradley Roberts is a transgender police officer with the Clark County School District ("CCSD") who identifies as a male officer.  When CCSD prohibited Roberts from using either the men's or women's bathrooms, Roberts sued for discrimination, retaliation, and hostile-work environment.

15

16

17

18

19

20

21

22

23

      The parties cross-move for partial summary judgment, and I am asked to decide whether this bathroom ban violated Title VII, which prohibits employers from discriminating on the basis of "sex."  CCSD argues that Title VII only prohibits discrimination based on biological sex, not gender identity.  But Title VII prohibits discrimination based on sex stereotypes, too, and the record shows that the district's bathroom ban was based on precisely the sort of stereotyping that the Ninth Circuit has found Title VII to prohibit.  So I grant Roberts partial summary judgment on the school district's discrimination liability under both Title VII and Nevada law.  Because neither party has demonstrated an absence of material fact on the remaining issues in this case, however, I otherwise deny their motions and refer this case for a mandatory settlement conference.

24

25

26

27

28

---

[1] I find these motions suitable for disposition without oral argument.  L.R. 78-2.

1

**The Factual Record**

2      The Clark County School District hired Bradley Roberts as a campus monitor in 1992.  At

3   that time, he was known as Brandilyn Netz and aspired to be a police officer.[2]  In 1994, Roberts

4   graduated from the Northern Nevada Law Enforcement Academy and was hired by CCSD as a

5   police officer.[3]  Roberts held that position without incident for seventeen years.

6   **A.      Brandilyn Netz becomes Bradley Roberts.**

7      In 2011, Roberts began dressing for work like a man, grooming like a man, and identifying

8   himself as a man.  And he started using the men's bathroom at work.[4]  When others complained that

9   a woman was using the men's bathroom, Roberts's commanding officers, Sgt. Anthony Jones and

10  Lt. Young, scheduled a meeting with him.[5]  Roberts confirmed that it was him and explained that he

11  was transgender and in the process of transitioning into a man.[6]  He also told them that he wants to

12  be known as Bradley Roberts and use the men's bathroom.[7]

13     But Roberts's commanding officers told him that he could not use the men's rooms and that

14  he should confine himself to the gender-neutral restrooms "to avoid any future complaints."[8]  In

15  response, Roberts sent a letter to his superiors again explaining that he was changing his name to

16  Bradley J. Roberts, wanted his coworkers to use male pronouns to reference him, and that he would

17  comply with the men's grooming code.[9]

18

19

20  _____

[2] ECF No. 55-1 at ¶ 2.

21
22  [3] *See id.*

23  [4] *Id.* at ¶¶ 3–4.

24  [5] *Id.*

25  [6] *Id.*

26  [7] *Id.*

27  [8] ECF No. 89-1 at ¶ 6.

28  [9] ECF No. 55-4 at 1.

**B.     CCSD officially bans Roberts from both the men's and women's bathrooms.**

The district responded to Roberts's letter by holding a second meeting on November 14, 2011, with Capt. Anthony York, Lt. Young, Roberts, and his union representative.[10]  Roberts repeated his requests: he wanted his coworkers to refer to him as a man, and he wanted to use the men's restrooms.[11]  Capt. York said no: as far as CCSD was concerned, Roberts would not be referred to as a man or allowed to use the men's restroom until he could provide official documentation of a name and sex change.[12]

Two days later, Capt. York asked Roberts to appear for a third meeting.[13]  York explained that the purpose of the meeting was to "discuss the issues in [Roberts's] memo to the department" and "facilitate . . . department action as soon as possible."[14]  Capt. York and Clark County's General Counsel Jon Okazaki told Roberts that they had decided he could informally use a man's name for the time being, but that "all official and formal documents" would contain his female name until he obtained a court order and a name-change packet from human resources.[15]  Okazaki further explained that Roberts was banned from the men's restrooms until he had a documented sex change.[16]  Okazaki told Roberts that he was required  "to use a gender-neutral or single occupancy restroom," not the female restrooms.[17]

---

[10] ECF No. 55-5; ECF No. 55-6.

[11] ECF No. 55-5; ECF No. 55-6.

[12] ECF No. 55-5.

[13] ECF No. 55-7.

[14] *Id.*

[15] *See* ECF No. 56-9; ECF No. 56-10.

[16] ECF No. 56-10 at 2.

[17] *See* ECF No. 56-9.  Okazaki also memorialized the meeting in an email to various officials.  He confirmed that "Netz shall <u>not</u> be allowed to use the men's restroom on CCSD property until CCSD receives appropriate documentation evidencing his anatomical change to male.  Netz shall also be directed to not use the women's restroom on CCSD property, since he looks like a male."  ECF No. 138-4 (emphasis original).

After the meeting ended, Capt. York sent Roberts, Chief Ketsaa, Lt. Young, and Okazaki proposed language for a memo regarding Roberts's name change:

> Officer Netz, P# 183 is in the final process of a name change to Brad Roberts.  In order to assist Officer Netz with this transition, effective immediately, the department will be recognizing him as Brad and using male pronouns in our interaction with him.  As soon as Officer Netz's official name is changed to Brad Roberts, he will be using that name on a legal basis.[18]

Roberts responded, "[t]hat's great and to the point."[19]  He also asked Capt. Young to "include the [Nevada Equal Rights Commission] document or parts thereof, that you feel should be included" so that his coworkers and commanding officers understand that asking "below the belt" questions may constitute sexual harassment.[20]  Capt. York responded: "I am in receipt of your request and have forwarded it to the Legal Department for input."[21]

## C.    Clark County circulates an email informing Roberts's coworkers that they should refer to him as a man.

A few days after their third meeting with Roberts, Capt. York, Chief Ketsaa, Lt. Young, and Okazaki emailed the entire department that Roberts was changing his name; that everyone should recognize him by his new name, Brad, and use male pronouns when referring to him; and that discriminating on the basis of gender identity violates Nevada law.[22]  Roberts claims that this email "blindsided" him;[23] he thought his name change would be treated like any other personnel matter and that the announcement would be sent to supervisors and managers only—not to the entire

---

[18] ECF No. 55-8.

[19] ECF No. 55-9.

[20] *Id.*

[21] ECF No. 55-12.

[22] ECF No. 55-16 at 1.

[23] ECF No. 55-1 at ¶¶ 20–22.

department.[24]

In early December, Roberts's name-change petition was granted.[25]  He immediately updated his driver's licence to identify his gender as male and submitted a completed name-change packet to human resources.[26]  Once again, Clark County issued a department-wide email explaining that Roberts had changed his name and that now his name change would take effect for purposes of his official department records.[27]  But Roberts's records were apparently never updated, because in January 2012, he received a new insurance card listing his gender as "female."[28]

**D.**  **Roberts files administrative charges and CCSD lifts the bathroom ban.**

Roberts filed an administrative charge with the Nevada Equal Rights Commission ("NERC") that same month.[29]  He alleged gender-identity discrimination on account of the bathroom ban, and harassment during the November meetings with CCSD officials.[30]

Capt. York and Okazaki responded to NERC that "Officer Netz's name was legally changed to Bradley Joseph Roberts [and] CCSDPD has changed Officer Roberts'[s] name in its records accordingly had acknowledge his identity with the male gender."[31]  The next day, NERC notified Roberts that his administrative charge would not be mediated because the school district refused to participate.[32]

But no records had been updated.  In February, Roberts contacted human resources and asked

---

[24] *See id.*

[25] ECF No. 55-18.

[26] ECF No. 55-1 at ¶ 24.

[27] ECF No. 55-20.

[28] ECF No. 55-1 at ¶¶ 26–27.

[29] ECF No. 55-24.

[30] *Id.*

[31] ECF No. 56-3 at 2.

[32] ECF No. 56-4.

them to update his gender.[33]  In March, however, a secretary reported to Capt. York that "Officer Roberts'[s] gender in the HR records still appears as a female."[34]  And the bathroom ban remained in effect.

In May, NERC issued a probable-cause finding and informed Roberts that CCSD likely discriminated against him.[35]  NERC then set Roberts's case for a public hearing.[36]  But a month before the hearing, the department issued a new bathroom policy so that Roberts was no longer singled out and required to use the gender-neutral bathrooms.[37]

CCSD's general counsel emailed Chief Ketssa, Capt. Young, and others to inform them that Roberts had been notified of the new bathroom policy and "that as of this date he was no longer directed to use single occupant/gender neutral bathrooms at non-school District sites."[38]  He also wrote "that the notice of hearing be withdrawn and this case closed as it is moot."[39]  A week later, NERC did just that—it issued a three-line notice of withdrawal that closed Roberts's case because the school district had allegedly "taken measures" that rendered his complaint "moot."[40]

Roberts responded by filing a second administrative charge that alleged sex discrimination based on the bathroom ban, offensive comments made by coworkers, and the department-wide emails.[41]  He also alleged that the district retaliated against him and subjected him to a hostile-work

---

[33] ECF No. 56-5.

[34] ECF No. 56-26 at 1.

[35] ECF No. 56-11.

[36] *See* ECF No. 56-18.

[37] ECF No. 55-1 at ¶ 38 (citing ECF No. 56-16).

[38] ECF No. 56-17.

[39] *Id.*

[40] ECF No. 56-18.

[41] ECF No. 56-20.

environment because he filed the NERC complaint[42] and various coworkers asked prying questions and made crude gestures and remarks to Roberts.[43]

By February of 2012, CCSD still had not updated Roberts's gender in his personnel records.[44] Two years later, the Equal Employment Opportunity Commission sent Roberts a right-to-sue letter[45] and he commenced this action.[46]

**E.    The lawsuit and cross-motions for partial summary judgment**

Roberts alleges that the department subjected him to discrimination, harassment, and retaliation, and he asserts six claims: gender discrimination and harassment under Title VII; gender-identity expression and harassment under Nevada's Anti-Discrimination Statute, NRS 613.330; and retaliation under Title VII and NRS 613.340.[47]

While discovery in this case was ongoing, Roberts moved for partial summary judgment and requested a finding that he was subjected to discrimination, harassment, and retaliation during the period that the department banned him from the men's room.[48] He is joined by amici curiae Lambda Legal Defense and Education Fund.[49] CCSD filed a countermotion seeking partial summary judgment in its favor on the same claims.[50] Recognizing the complex nature of this case and the various legal arguments raised by the parties, I deferred ruling on these motions until after discovery

---

[42] *Id.*

[43] *See id.*

[44] *See* ECF No. 55-25.

[45] ECF No. 89-2.

[46] *See* ECF No. 1-1 (dated October 16, 2014).

[47] Roberts also alleged a claim for negligent training and supervision, which I dismissed. *See* ECF No. 49.

[48] ECF No. 54 at 6:15–20.

[49] ECF No. 105.

[50] ECF No. 89 at 9.

closed and the parties had an opportunity to brief me on the impact of that discovery.[51]  I also granted

the parties leave to file two supplemental briefs and responses.[52]  I now consider the parties' fully

briefed arguments.

**Discussion**

**A.    Summary-judgment standards.**

The legal standard governing the parties' motions is well settled: a party is entitled to

summary judgment when "the movant shows that there is no genuine issue as to any material fact

and the movant is entitled to judgment as a matter of law."[53]  An issue is "genuine" if the evidence

would permit a reasonable jury to return a verdict for the nonmoving party.[54]  A fact is "material" if

it could affect the outcome of the case.[55]

When considering a motion for summary judgment, I view all facts and draw all inferences in

the light most favorable to the nonmoving party.[56]  The purpose of summary judgment is "to isolate

and dispose of factually unsupported claims"[57] and to determine whether a case "is so one-sided that

one party must prevail as a matter of law."[58]  It is not my role to weigh evidence or make credibility

determinations.[59]  If reasonable minds could differ on material facts, summary judgment is

---

[51] ECF No. 131.

[52] *Id.*  Roberts seeks leave to exceed the ten-page limit I set for these briefs because a transcription error pushed his motion into the eleventh page by three lines.  ECF No. 143.  Good cause appearing, I grant this request.

[53] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R. CIV. P. 56(c)).

[54] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[55] *Id.* at 248.

[56] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[57] *Celotex Corp.*, 477 U.S. at 323–24.

[58] *Anderson*, 477 U.S. at 252.

[59] *Id.* at 249, 255.

1   inappropriate.[60]

2       If the moving party shows that there is no genuine issue as to any material fact, the burden

3   shifts to the nonmoving party, who must "set forth specific facts showing that there is a genuine

4   issue for trial."[61]  The nonmoving party "must do more than simply show that there is some

5   metaphysical doubt as to the material facts"; the nonmoving party "must produce specific evidence,

6   through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary

7   basis on which a reasonable fact finder could find in his favor.[62]  When reviewing the parties' papers,

8   I only consider properly authenticated, admissible evidence.[63]

9       In their cross-motions for summary judgment, the parties focus on two overarching issues:

10  (1) whether Roberts properly exhausted his administrate remedies; and, (2) if so, whether either party

11  is entitled to summary judgment on the merits of Roberts's discrimination, harassment, or retaliation

12  claims.  I consider the exhaustion issue first.

13  **B.    Roberts adequately exhausted his administrative remedies.**

14      The school district raises two arguments for why Roberts did not properly exhaust his

15  administrative remedies: (1) Roberts's charges did not provide Clark County with sufficient notice,

16  and (2) Roberts's claims are untimely.[64]  Neither has any merit.

17

18

---

19  [60] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

20

21  [61] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 323.

22  [62] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

23

24  [63] Fed. R. Civ. P. 56(c); *Orr*, 285 F.3d at 773–74.

25  [64] CCSD also argues that Roberts's state-law claim is barred by NRS 233.170(2) because it "agreed to cease the unlawful" bathroom ban.  But NRS 233.170(2) requires the parties to mediate and then

26  to reach an agreement that addresses all of the issues in the charge.  And the district cites no evidence to show that an official agreement was reached, nor did it participate in a mediation with

27  Roberts.  ECF 56-4.  To the extent CCSD argues that its revised bathroom policy mooted Roberts's charge, this contention fails because Roberts alleged claims related to more than the bathroom ban,

28  and the revised policy did not specifically address Roberts's allegations.

1      **1.**      ***Roberts's administrative charges provided CCSD with adequate notice.***

2          The district argues that Roberts's administrative charges did not provide adequate notice

3  because they did not contain explicit citations to Title VII or NRS 613.330.[65]  But plaintiffs are not

4  required to list specific laws or causes of action in a charge.  "[A] charge is sufficient when the

5  Commission receives from the person making the charge a written statement sufficiently precise to

6  identify the parties, and to describe *generally* the action or practices complained of."[66]  And I must

7  construe charges "with utmost liberality since they are made by those unschooled in the technicalities

8  of formal pleading."[67]

9          Roberts's administrative charges were more than sufficient to put CCSD on notice.  Indeed, I

10  remarked during the motion-to-dismiss hearing in August 2015 that Roberts's administrative charges

11  are "possibly the most fact intensive that I have seen."[68]  They describe the parameters of the

12  bathroom ban, the series of meetings in November that were used to justify it, the email regarding

13  Roberts's name charge, the department's failure to update his personnel records, and the alleged

14  offensive comments made by CCSD employees.[69]  I thus find that CCSD was provided with

15  adequate notice of Roberts's claims.

16      **2.**      ***Roberts's claims are timely.***

17          CCSD next argues that Roberts's state-law claims are untimely.  It reasons that NERC

18  withdrew Roberts's first charge (which is the only charge that explicitly mentioned Nevada law), and

19  that this means that the statute of limitations has since expired on these claims.

20          To toll Nevada's statute of limitations, an administrative charge merely needs to be

---

[65] *See generally* ECF No. 89 at 23–26; ECF No. 115 at 12–13.

[66] 29 C.F.R. § 1601.12(b) (emphasis added).

[67] *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002), as amended Feb. 20, 2002 (quoting *Kaplan v. Int'l All. of Theatrical & Stage Emp. & Motion Picture Mach. Operators of U.S. & Canada*, 525 F.2d 1354, 1359 (9th Cir. 1975)).

[68] ECF No. 117 at 25:1–2.

[69] ECF No. 55-24 at 5–6.

"pending" before NERC.[70]  And here, regardless of what happened to Roberts's first charge with NERC, CCSD does not dispute that Roberts filed a second charge that was still pending with the agencies leading up to the EEOC issuing its right-to-sue letter.  While it is true that Roberts's second charge did not mention Nevada law explicitly, as I explained above, it didn't need to.

Even if the limitations period were not tolled statutorily, I would equitably toll it.  The statutory period for a discrimination claim can be equitably tolled if a plaintiff diligently pursues his claims with the administrative agency, prejudice to the defendant is slight, and justice favors tolling.[71]  In *City of North Las Vegas v. State Local Government Employee-Management Relations Board*, for example, the Nevada Supreme Court tolled the statutory period because the plaintiff diligently filed a charge with NERC as soon as he realized he was supposed to, and there was no indication that the defendant would be severely prejudiced.[72]  Here, Roberts filed two administrative charges, he cooperated fully in the agency investigations, and any prejudice to CCSD is slight given that the federal discrimination claim—based on the same facts as the Nevada claim—would go forward anyway.  I thus find that Roberts's claims are timely.**[73]**

**C.**   **Roberts is entitled to summary judgment on the school district's discrimination liability, but neither party is entitled to judgment on the other issues in this case.**

*1.*   ***Title VII protects against gender discrimination.***

Nevada law broadly prohibits "gender" discrimination,[74] but Title VII prohibits only

---

[70] NRS 613.420 states that the statute of limitations period is tolled "during the pendency of the complaint before [NERC]."

[71] *City of N. Las Vegas v. State Local Gov't Employee-Mgmt. Relations Bd.,* 261 P.3d 1071, 1077 (Nev. 2011); *see also Copeland v. Desert Inn Hotel*, 673 P.2d 490, 491 (Nev. 1983).

[72] *City of N. Las Vegas*, 261 P.3d at 1077; *see also State Dep't of Taxation v. Masco Builder Cabinet Grp.,* 265 P.3d 666, 672 (Nev. 2011) (limitations period tolled where agency apprised of allegations and plaintiff merely failed to file the proper form).

[73] Further, the bathroom ban was enforced through at least October 2012, which would have given Roberts until July 2013 to file; he met that deadline.  *See* Nev. Rev. Stat. § 613.420.

[74] Nev. Rev. Stat. § 613.330(1) ("it is an unlawful employment practice for an employer: (a) . . . to discriminate against any person with respect to the person's  . . . terms, conditions or privileges of

discrimination "because of . . . sex."[75]  CCSD argues that this is an important difference, and that Title VII does not prohibit *gender* discrimination.  Thus, as long as it treated Roberts like any other person of his biological sex, it did not discriminate against him under Title VII.  To resolve this dispute, I must first answer the threshold question: does Title VII's protection against "sex" discrimination include gender-identity discrimination?

> a.  *The weight of authority suggests that Title VII's use of the word "sex" encompasses protections for discrimination against gender identity.*

Our jurisprudential understanding of Title VII's prohibition against discrimination based on sex has evolved considerably since the statute's enactment in 1964.  When Title VII was amended in 1972, courts understood the phrase "because of sex" to prohibit only discrimination that impeded women from attaining "equal footing with men."[76]  This had the unfortunate effect of allowing employers to offer health-benefit packages that denied coverage for pregnancy-related expenses.[77] And it triggered the Seventh Circuit's decision in *Ulane v. Eastern Airlines*, in which the Court held that Title VII does not "prohibit discrimination against transsexuals" because "Congress had a narrow view of sex in mind when it passed [Title VII]."[78]

When the Supreme Court decided *Price Waterhouse v. Hopkins* in 1989, it broadened the

---

employment, because of his or her race, color, religion, sex, sexual orientation, gender identity or expression, age, disability or national origin; or (b) To limit, segregate or classify an employee in a way which would deprive or tend to deprive the employee of employment opportunities or otherwise adversely affect his or her status as an employee, because of his or her race, color, religion, sex, sexual orientation, gender identity or expression, age, disability or national origin.").

[75] 42 U.S.C. § 2000e-2(a) (making it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex. . .").

[76] *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 662 (9th Cir. 1977) (discussing the legislative history of Title VII), *overruling recognized in Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000).

[77] *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 128 (1976).

[78] *Ulane v. Eastern Airlines*, 742 F.2d 1081, 1086–87 (7th Cir. 1984).

notion of discrimination "because of sex" under Title VII.[79]  Hopkins was a senior manager up for partnership at a national accounting firm.[80]  Everyone agreed that Hopkins was great at her job, but some of the partners disliked the fact that she did not act like "a lady."[81]  Hopkins was told that she should not use profanity, that she "overcompensated for being a woman," and that her chances for partnership would be improved if only she could "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."[82]

The High Court held that Title VII prohibited Hopkins's employer from making employment decisions based on these sorts of gender stereotypes.[83]  The Court explained that Title VII does not operate merely to keep men and women on an "equal footing," it protects people from all forms of "sex stereotyping."[84]  It noted that "Congress'[s] intent to forbid employers to take gender into account in making employment decisions appears on the face of the statute," and these words "mean that gender must be irrelevant to employment decisions."[85]

Some circuits read *Price Waterhouse* differently.  In *Etsitty v. Utah Transit Authority*, the Tenth Circuit applied *Ulane* and held that transgender people are not a protected class under Title VII.[86]  And the Seventh Circuit recently held that Title VII does not protect against discrimination

---

[79] *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

[80] *Id.* at 234.

[81] *Id.* at 234–35.

[82] *Id.*

[83] *Id.* at 250–53.

[84] *Id.* at 251.

[85] *Id.* at 240; *see also Smith v. City of Salem, Ohio*, 378 F.3d 566, 572 (6th Cir. 2004) ("The Supreme Court made clear that in the context of Title VII, discrimination because of 'sex' includes gender discrimination: 'In the context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.'") (citation omitted).  Almost a decade later in *Oncale v. Sundowner Offshore Services*, 523 U.S. 75 (1998), the Court again rejected the notion that Title VII only prohibits discrimination that impedes equal footing between the two sexes.

[86] *Etsitty v. Utah Trans. Auth.*, 502 F.3d 1215, 1222 (10th Cir. 2007).

1  based on sexual orientation under its own precedent, including *Ulane*.[87]

2  But the Ninth Circuit disagrees with the Tenth and Seventh Circuits' approach.  In *Schwenk*

3  *v. Hartford*, the Ninth Circuit wrestled with questions about gender under the Gender Motivated

4  Violence Act.[88]  The defendant contended that the Act does not extend to conduct motivated by a

5  person's gender, and that—like Title VII—it extends only to conduct motivated by a victim's

6  biological status as a male or female.[89]  The panel extensively discussed the issue in the context of

7  Title VII, explaining that "'sex' under Title VII encompasses both sex—that is, the biological

8  differences between men and women—*and gender*."[90]  Early cases, the *Schwenk* court noted, had

9  refused "to extend protection of Title VII to transsexuals because discrimination against transsexuals

10  is on the basis of 'gender' rather than 'sex.'"[91]  These early cases distinguished between "[t]he term

11  'sex,'" which referred to "an individual's distinguishing biological or anatomical characteristics,"

12  and the "term 'gender,' [which] refers to an individual's sexual identity, or socially-constructed

13  characteristics."[92]  The unanimous panel then reasoned that this sex/gender distinction was overruled

14  by *Price Waterhouse* and that Title VII applies both to discrimination based on concepts of sex and

15  discrimination based on other stereotypes about sex, including gender identity:

16  In *Price Waterhouse*, which was decided after *Holloway* and *Ulane*, the
   Supreme Court held that Title VII barred not just discrimination based on

17  the fact that Hopkins was a woman, but also discrimination based on the
   fact that she failed "to act like a woman"—that is, to conform to

18  socially-constructed gender expectations. . . . Thus, under *Price
   Waterhouse*, "sex" under Title VII encompasses both sex—that is, the

19  biological differences between men and women—*and* gender.
   **Discrimination because one fails to act in the way expected of a man**

20

21

22

23  [87] *Hively v. Ivy Tech Cmty. Coll.*, — F.3d —, 2016 WL 4039703, at *1–3 (7th Cir. 2016).

24  [88] *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000).

25  [89] *Id.* at 1201–02.

26  [90] *Id.* at 1202 (emphasis in original)

27  [91] *Id.* at 1201 (citing to *Holloway v. Arthur Andersen*, 566 F.2d 659 (9th Cir. 1977)).

28  [92] *Id.*

**or woman is forbidden under Title VII.**[93]

The Ninth Circuit's unpublished decision in *Kastl v. Maricopa County Community College District* leaves little doubt which way the circuit is leaning in transgender Title VII cases.[94]  Kastl, a transgender community-college teacher, identified as a woman.[95]  But Kastl's employer banned her from the women's bathroom, stating that she would only be allowed in if she proved she had biologically changed her sex to female.[96]  The Ninth Circuit panel held that these facts stated a prima facie case of gender discrimination.[97]  It reasoned that, after "*Schwenk*, it is unlawful to discriminate against a transgender (or any other) person because he or she does not behave in accordance with an employer's expectations for men or women."[98]  And it found that "gender stereotyping is direct evidence of sex discrimination prohibited by Title VII."[99]

Other circuits have reached conclusions consistent with *Schwenk's* reasoning.  The Sixth Circuit held that "[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior," and it found that the City of Cincinnati violated Title VII by discriminating against a male police officer who dressed like a woman.[100]  The Eleventh Circuit held that the Georgia General Assembly's Office of Legislative

---

[93] *Id.* at 1202 (italicized emphasis original; bold emphasis added).

[94] *Kastl v. Maricopa Cty. Cmty. Coll. Dist.,* 325 F. App'x 492 (9th Cir. 2009).

[95] *Id.* at 493–94.

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*  The panel ultimately upheld summary judgment for the employer because it provided unrebutted evidence that Kastl was banned from the bathroom for safety reasons, not because of her gender.  *Id.*

[100] *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (quoting *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004)).

1  Counsel violated Title VII when it terminated a person because he was transitioning into a woman.[101]

2  And just this year, the Fourth Circuit held that the Gloucester County School Board violated

3  analogous Title IX provisions by segregating transgender students from their peers based on the

4  students' "biological sex."[102]

5       The EEOC has joined this growing majority.[103]  In *Macy v. Holder*, the Commission

6  concluded that intentional discrimination against a transgender person "is, by definition,

7  discrimination 'based on . . . sex,' and such discrimination therefore violates Title VII."[104]  The

8  Commission reasoned that "[a] person is defined as transgender precisely because of the perception

9  that his or her behavior transgresses gender stereotypes."[105]  In *Lusardi v. McHugh*, the Commission

10  considered a bathroom ban on a transgender employee.  It applied *Price Waterhouse*, its progeny,

11  and *Macy* to hold that "[e]qual access to restrooms is a significant, basic condition of employment,

12  and [] denying transgender individuals access to a restroom consistent with gender identity

13  discriminates on the basis of sex in violation of Title VII."[106]

14           b.    *I join the weight of authority and hold that discrimination against a person*
             *based on transgender status is discrimination "because of sex" under Title*
15           *VII.*

16       I realize that the Ninth Circuit's reasoning in *Schwenk* is merely persuasive, as is the

17  reasoning of the many other tribunals I have cited to.  But because it appears that the Ninth Circuit

18

_____

19  [101] *Glenn v. Brumby*, 663 F.3d 1312, 1316–17 (11th Cir. 2011).

20  [102] *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 722–23 (4th Cir. 2016).

21  [103] The EEOC's decisions should be deferred to when persuasive.  *Nat'l R.R. Passenger Corp. v.*
22  *Morgan*, 536 U.S. 101, 111 (2002) (citations omitted).  *See also Fabian v. Hosp. of Cent. CT*, 2016
    WL 1089178, at *6 (D. Conn. Mar. 18, 2016) (collecting authority and noting, "though most of the
23  earliest cases held that Title VII does not protect gender identity, the weight of authority has begun to
    shift the other way, especially (though not uniformly) after the Supreme Court's decision in *Price*
24  *Waterhouse*").

25  [104] *Macy v. Holder*, No. 0120120821, 2012 WL 1435995, at *11 (E.E.O.C. Apr. 20, 2012).

26  [105] *Id.* at *9 (quoting *Glenn*, 663 F.3d at 1316–17).

27
    [106] *Tamara Lusardi v. John McHugh, Sec'y, Dep't of the Army*, No. 0120133395, 2015 WL 1607756,
28  at *9 (E.E.O.C. Apr. 1, 2015).

1   would hold that gender-identity discrimination is actionable under Title VII, I see no reason to depart

2   from the heavy weight of this authority.  Nothing in the few contrary decisions cited by the school

3   district persuades me otherwise.  The contrary Seventh and Tenth Circuit decisions provide no

4   cogent analysis of Title VII's language or Supreme Court caselaw.  They rely heavily on *Ulane*, a

5   case that predates *Price Waterhouse* and which the Ninth Circuit recognized in *Schwenk* retains

6   questionable precedential value.[107]  I thus conclude that discrimination "because of sex" under Title

7   VII includes discrimination based on a person's gender.

8

9
>    **2.      *Roberts is entitled to judgment on his gender-discrimination claims because CCSD discriminated against him based on his transgender status.***

10      To survive summary judgment in the context of Title VII, a plaintiff must establish a prima

11  facie case of discrimination by presenting evidence that "gives rise to an inference of unlawful

12  discrimination."[108]  This may be established with direct or circumstantial evidence of discriminatory

13  intent or through the *McDonnell Douglas* burden-shifting framework.[109]

14      Direct evidence establishes the department's discriminatory intent here.  It banned Roberts

15  from the women's bathroom because he no longer behaved like a woman.  This alone shows that the

16  school district discriminated against Roberts based on his gender and sex stereotypes.  And the

17  department also admits that it banned Roberts from the men's bathroom because he is biologically

18  female.  Although CCSD contends that it discriminated against Roberts based on his genitalia, not

19  his status as a transgender person, this is a distinction without a difference here.  Roberts was clearly

20

21  [107] *See, e.g.*, *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D. D.C. 2008) (questioning whether
22  *Ulane* is still good law because *Price Waterhouse* "eviscerated" the anatomical or chromosomal
    understanding of "sex"); *Schwenk*, 204 F.3d at 1201–02 (stating that what matters is not the victim's
23  biology but what is "in the mind of the perpetrator"); *see also Hively v. Ivy Tech Comty. Coll.,* 2016
    WL 4039703, at *3–15 (7th Cir., July 28, 2016) (conceding that "the writing is on the wall" and "our
24  society can[not] continue to condone a legal structure in which employees can be fired, harassed,
    demeaned, singled out . . . based on who they date, love, or marry," but recognizing that the court
25  was nevertheless bound by its precedent, including *Ulane*, to hold that sex-based discrimination
    under Title VII does not include sexual-orientation discrimination).
26

27  [108] *Cordova*, 124 F.3d at 1148; *see also McDonnell Douglas*, 411 U.S. at 802.

28  [109] *See Metoyer v. Classman*, 504 F.3d 919, 931 (9th Cir. 2007).

treated differently than persons of both his biological sex and the gender he identifies as—in sum, because of his transgender status.

Even if I apply the *McDonnell Douglas* framework, Roberts is still entitled to summary judgment on the school district's discrimination liability.  Under this framework, Roberts carries the initial burden of establishing a prima facie case of discrimination.[110]  Then the burden shifts to the school district to articulate a legitimate, nondiscriminatory reason for its conduct.[111]  If the defendant provides a justification, the burden shifts back to Roberts to show that the justification is a mere pretext for discrimination.[112]

To state a prima facie claim for discrimination, Roberts must show that (1) he belongs to a protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action and, (4) the employer treated him differently than a similarly situated employee who does not belong to the same protected class.[113]  I apply the same framework to Roberts's gender-identity discrimination claim under NRS 613.330.[114]  CCSD only disputes the third and fourth elements—that Roberts suffered an adverse employment action and was treated differently than similarly situated employees.

　　　　　　　　*a.*　　*The bathroom ban was an adverse employment action.*

Adverse employment actions include any decision by an employer affecting "compensation, terms, conditions, or privileges of employment."[115]  As the EEOC explained in *Lusardi*, "[e]qual

---

[110] *McDonnell Douglas*, 411 U.S. at 802.

[111] *Id.*

[112] *Id.* at 804.

[113] *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802).

[114] *See Apeceche v. White Pine Cty.*, 615 P.2d 975, 977–78 (Nev. 1980).

[115] 42 U.S.C. § 2000e–2(a)(1); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004).

access to restrooms is a significant, basic condition of employment."[116]  The Commission reasoned that restroom access is a basic condition of employment because it is mandated by OSHA.[117]  And it concluded that segregating bathroom access based on a person's transgender status constitutes a significant harm because it provides one set of terms and conditions of employment for transgender individuals and another set for male and female individuals.[118]  I find the Commission's reasoning in *Lusardi* persuasive, and I adopt it.  The school district's bathroom ban was an adverse employment action.

> b.   *CCSD treated Roberts differently than similarly situated employees.*

The school district contends that Roberts was not treated differently than similarly situated employees because his anatomy made him a female, and other females were not permitted to enter the men's restroom.  But Roberts was not allowed to use the female bathroom either—so he was treated differently than other females.[119]

> c.   *CCSD failed to articulate a legitimate nondiscriminatory reason for the bathroom ban.*

Because of the direct evidence that CCSD discriminated against Roberts on the basis of gender, I need not proceed with the *McDonnell Douglas* burden-shifting analysis.[120]  Had I, I would have noted that, although the department contends that the bathroom ban was implemented to protect

---

[116] *Lusardi*, 2015 WL 1607756, at *9.

[117] *See id.* (citing 20 C.F.R. 1910.141 § (c)(1)(i) (requiring that employers provide access to toilet facilities so that all employees can use them when they need to do so)).

[118] *Id.*

[119] CCSD cites *Kastl* for the proposition that the Ninth Circuit has "held that enforcing restroom use practices based on biological gender is not unlawful." ECF No. 89 at 17 (emphasis original) (citing *Kastl*, 325 Fed. App'x. at 492).  But that is not what *Kastl* holds.  The Ninth Circuit found that the plaintiff stated a prima facie case for gender discrimination under Title VII and *Price Waterhouse* but failed to put forward sufficient evidence that the bathroom ban was motivated by her gender.

[120] *Cordova*, 124 F.3d at 1148.

1    "the privacy rights of other CCSD employees and its students,"[121] there is no evidence to support this

2    contention.  CCSD cites to Okazaki's deposition, but Okazaki said nothing about privacy rights.  Nor

3    did he say that the department based its policy on those rights as opposed to Roberts's gender and

4    anatomy.[122]

5          I therefore grant partial summary judgment in Roberts's favor and against CCSD on the

6    question of whether it discriminated against Roberts under Title VII and NRS 613.330.  I leave for

7    trial the question of Roberts's damages because they remain genuinely disputed.

8          ***3.      Neither party is entitled to summary judgment on Roberts's harassment claims.***

9          Title VII's prohibition against discrimination "because of sex" encompasses the right to be

10   free of a hostile-work environment and be "free from discriminatory intimidation, ridicule, and

11   insult."[123]   Roberts's hostile-work environment claim requires him to prove not only that he was

12   subjected to unwelcome harassment, but that this harassment was sufficiently severe or pervasive.[124]

13   "Severe and pervasive" harassment is harassment that a reasonable person would find frequent,

14   severe, or abusive enough to alter the conditions of the workplace.[125]  Petty harassment, even

15   "singling [someone] out for unfavorable treatment," is not necessarily enough.[126]  I must consider the

16   totality of the circumstances, including: "[the] frequency of the discriminatory conduct; its severity;

17   whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

18   unreasonably interferes with an employee's work performance."[127]

19

---

20   [121] ECF No. 136 at 10.

21   [122] *See* ECF No. 136-11 at 3–4.

22
23   [123] *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)).

24   [124] *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (quoting *Fuller v. City of*
25   *Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (internal quotation marks omitted)).

26   [125] *Id.*

27   [126] *Swenson v. Potter,* 271 F.3d 1184, 1195 (9th Cir. 2001).

28   [127] *Nichols v. Azteca*, 256 F.3d 870, 871–72 (9th Cir. 2001).

None of the incidents cited by Roberts is frequent, severe, or abusive enough for me to rule that he was "severely and pervasively" harassed as a matter of law.  Roberts mainly points to the various emails that the department sent regarding his transition.  But Roberts was told about these emails ahead of time—and he even agreed to the wording in at least the initial one.  There is conflicting evidence about whether Roberts was told that the email would be sent out to the entire department.  CCSD provides evidence that department staff were not rude or disrespectful to Roberts.[128]  And Roberts's other allegations about the delays in processing his personnel records and the comments made by coworkers are not so severe that a reasonable juror must conclude they were "severe or pervasive."

On the other hand, I cannot say that a reasonable person would not find these acts to be severe enough, given their context.  The school district sent the emails to every police-department employee and disclosed sensitive information about Roberts's sexual identity.  It invited Roberts's coworkers to ask questions about his transition.  And Roberts has introduced evidence that department staff made inappropriate remarks about his genitalia, among other things.  With evidence on both sides, I thus deny summary judgment to either party on Roberts's harassment/hostile-work-environment claim.

### 4.    *Neither party is entitled to summary judgment on Roberts's retaliation claims.*

To succeed on his retaliation claim, Roberts must prove that (1) he was engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action.[129]  Causation is a "but for" test: would the retaliatory act not have happened but for the plaintiff's protected activity.  Roberts contends that his protected activity was requesting to use the men's bathroom and refusing to provide medical documentation to the department.  CCSD then allegedly retaliated by banning Roberts from the

---

[128] *See* ECF No. 89-1 at 5–6.

[129] *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (citation omitted).

bathroom.[130]

Roberts has not established beyond genuine dispute that the bathroom ban was motivated by his request or refusal to provide documents, rather than simply a response to the complaints the department received about a woman using the men's bathroom.  Roberts must prove that, but for his request or refusal to provide documents, CCSD would never have instituted the ban.  But there is little direct evidence that the department was retaliating against Roberts for protected activity and not just implementing a policy in response to complaints.  I thus deny summary judgment on Roberts's retaliation claim.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that plaintiff Bradley Roberts's motion for partial summary judgment **[ECF No. 54] is GRANTED in part and denied in part.  I grant summary judgment in Roberts's favor on the issue of the school district's liability for discrimination in violation of both Title VII and NRS 613.330; the motion is denied in all other respects.**

IT FURTHER IS ORDERED that Clark County School District's countermotion for partial summary judgment **[ECF No. 89] is DENIED**.

IT IS FURTHER ORDERED that Roberts's motion for leave to file excess pages **[ECF No. 143] is GRANTED** nunc pro tunc.

IT IS FURTHER ORDERED that **this case is referred to the magistrate judge for a mandatory settlement conference.**

Dated this 4th day of October, 2016

_____
Jennifer A. Dorsey
United States District Judge

---

[130] Roberts also contends that the adverse action was that CCSD allowed him to be harassed.  But I would not grant summary judgment on this ground for the same reason that judgment is inappropriate on Roberts's harassment claim itself.